IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

EQUAL EMPLOYMENT      §
OPPORTUNITY COMMISSION,    §
            §
       Plaintiff,   §
            §   Civil Action No. 3:15-CV-0641-D
VS.            §
            §
S&B INDUSTRY, INC. d/b/a    §
FOX CONN S&B,       §
            §
       Defendant.   §

MEMORANDUM OPINION
AND ORDER

In this case alleging claims for discrimination and failure to accommodate under the
Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*, defendant
S&B Industry, Inc. d/b/a Fox Conn S&B ("S&B") moves to exclude the expert report and
testimony of Heather M. Hughes ("Hughes"), whom plaintiff Equal Employment
Opportunity Commission ("EEOC") intends to offer as an expert witness at trial.  For the
following reasons, the court grants the motion in part and denies it in part.

I

The relevant background facts of this case are set out in a prior memorandum opinion
and order of the court and need not be repeated at length.  *See EEOC v. S&B Indus., Inc.*,
2016 WL 7178969, at *1-3 (N.D. Tex. Dec. 8, 2016) (Fitzwater, J.) ("*S&B I*").  The EEOC
brings this action under the ADA, alleging that S&B discriminated against Katelynn Baker
("Baker") and Tia Rice ("Rice") by failing or refusing to hire them because of their disability

(hearing impairment), and failing or refusing to provide them a reasonable accommodation during the application process. *See id.* at *1.  The EEOC intends to call Hughes as an expert witness at trial to describe and detail the use of American Sign Language ("ASL"), the utilization of ASL interpreters, and the issues and implications of audism.[1]  The EEOC also expects "to offer testimony regarding phonocentric views in employment, caption writing communication and other alternative communication methods such as Communication Access and real-Time Translation [("CART")], and the use of other communication accommodations in the workplace."  P. Expert Witness Designations 3.

In her Report, Hughes states that her "objective is to provide background and historical information regarding the barriers that deaf and hard of hearing individuals face when attempting to access employment," and she lists the following five specific objectives in support of her overall objective:

1.  Provide background information on the historical barriers that deaf and hard of hearing face.
2.  Provide statistics on approximately how many deaf and hard of hearing individuals need access to employment.
3.  Determine what type of auxiliary aids would be most suitable for deaf and hard of hearing individuals when needing access to employment situations.
4.  Determine whether S&B Industry, Inc[.] could provide reasonable accommodations for deaf and hard of hearing individuals.
5.  Conduct assessment of reasonable accommodation options at S&B Industry, Inc.

---

[1]Hughes defines "Audism" in her November 2015 Expert Report ("Report") as "a negative and oppressive attitude towards deaf and hard of hearing individuals."  Report 4.

Report 3.

S&B moves to exclude Hughes's testimony, contending that her report is laden with stereotypes about "society" that she seeks to unreliably attribute to S&B; that Hughes has ignored key and relevant data in her report, embraces flatly erroneous and unsupported assumptions, and cherry-picks only information supporting her conclusions; that Hughes's methodology and conclusions are untrustworthy; and that Hughes's opinion is not helpful to the trier of fact in determining whether S&B actually subjected Rice and Baker to intentional discrimination in June 2013.  The EEOC opposes the motion.

## II

"The court decides th[is] motion[] in its role as gatekeeper under Fed. R. Evid. 702." *Johnson v. BAE Sys. Land & Armaments, L.P.*, 2014 WL 1714487, at *25 (N.D. Tex. Apr. 30, 2014) (Fitzwater, C.J.) (citations omitted).  "The court may admit proffered expert testimony only if the proponent, who bears the burden of proof, demonstrates that (1) the expert is qualified, (2) the evidence is relevant to the suit, and (3) the evidence is reliable." *Nunn v. State Farm Mut. Auto. Ins. Co.*, 2010 WL 2540754, at *2 (N.D. Tex. June 22, 2010) (Fitzwater, C.J.) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)).

The first requirement is that the expert be qualified.[2]  "Before a district court may allow a witness to testify as an expert, it must be assured that the proffered witness is qualified to testify by virtue of [her] 'knowledge, skill, experience, training, or education.'"

--------

[2]As far as the court can tell, S&B does not move to exclude Hughes's testimony on the basis that she is not qualified to give an expert opinion in this case.

*United States v. Cooks*, 589 F.3d 173, 179 (5th Cir. 2009) (quoting Rule 702).  "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject ."  *Id*. (citing *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999)).  "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue.  Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility."  *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (citation omitted).

The second requirement is that the expert's testimony be relevant.  To be relevant, "expert testimony [must] 'assist the trier of fact to understand the evidence or to determine a fact in issue.'"  *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 245 (5th Cir. 2002) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993)).  "Relevance depends upon 'whether [the expert's] reasoning or methodology properly can be applied to the facts in issue.'"  *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (quoting *Daubert*, 509 U.S. at 593); *see also* Rule 702(d) (requiring that "expert has reliably applied the principles and methods to the facts of the case").

The third requirement is that the expert's testimony be reliable.  "Reliability is determined by assessing 'whether the reasoning or methodology underlying the testimony is scientifically valid.'"  *Knight*, 482 F.3d at 352 (quoting *Daubert*, 509 U.S. at 592-93); *see also* Rule 702(c) (requiring that "testimony [be] the product of reliable principles and methods").  Expert testimony "must constitute 'more than subjective belief or unsupported speculation.'"  *Nunn*, 2010 WL 2540754, at *2 (quoting *Daubert*, 509 U.S. at 590).  The

court focuses on the expert's methodology, not the conclusions generated by it.  *Id*. at *4 (citing *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997)).  If, however, "there is simply too great an analytical gap between the [basis for the expert opinion] and the opinion proffered," the court may exclude the testimony as unreliable.  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also Johnson v. Arkema, Inc.*, 685 F.3d 452, 460-61 (5th Cir. 2012).  This review is usually conducted by considering the five nonexclusive *Daubert* factors.[3]  But these factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of [the] testimony."  *Kumho*, 526 U.S. at 150.

The burden is on the proponent of the expert testimony to establish its admissibility by a preponderance of the evidence.  *See Daubert*, 509 U.S. at 592 n.10; *see also Johnson*, 685 F.3d at 459.  The court's inquiry is flexible in that "[t]he relevance and reliability of expert testimony turns upon its nature and the purpose for which its proponent offers it."  *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010) (citation omitted).  "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the [trier of fact's] consideration."  *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987).

---

[3]The five nonexclusive *Daubert* factors are: (1) whether the expert's technique can be or has been tested; (2) whether the method has been subjected to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community.  *Daubert*, 509 U.S. at 593-94.

"Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *Nunn*, 2010 WL 2540754, at *5.

III

S&B seeks to exclude Hughes's testimony related to the first two specific objectives stated in the Report: (1) providing background information on the historical barriers that deaf and hard of hearing face, and (2) providing statistics on approximately how many deaf and hard of hearing individuals need access to employment.

A

S&B maintains that Hughes's opinions related to objectives 1 and 2 are unreliable, irrelevant, inadmissable, and contain enormous analytical gaps. It contends that, when asked at her deposition about the relevance of objectives 1 and 2, Hughes testified "that she thinks S&B acted in conformity with her stereotype of society being anti-deaf," D. Br. 6; that it is difficult to conceive of a bigger analytical gap than what is present between Hughes's data (stereotypes of society's anti-deaf views) and her opinion that S&B acted in conformity with these anti-deaf stereotypes in June 2013 regarding Rice and Baker; that given the "complete disconnect" between Hughes's societal assumptions and the facts of this case, permitting Hughes's testimony on objectives 1 and 2 threatens to mislead the jury, *id.*; that Hughes's opinions regarding the first two specific objectives are not helpful to the jury "given [that] they do not have anything to do with what happened in June 2013 with Rice/Baker," *id.* at 7; and that for all of the stated reasons, these opinions are inadmissible under *Daubert*.

The EEOC responds that background information on the historical barriers that deaf and hard of hearing face "is relevant and important to the jury's understanding of the facts of this case," P. Br. 5; that expert witnesses on deaf culture have been used in other cases to aid in teaching the jury; and that just as her expert testimony about deaf culture was "unquestionably helpful to the jury in *EEOC v. Service Temps, Inc.*, her expert testimony about the deaf culture and community, and other background information relating to deaf persons in the workplace will be helpful to the jury in this case as well,"[4] *id*; and that courts in discrimination cases routinely allow expert testimony on the topic of stereotyping. Regarding Hughes's opinions on objective 2, the EEOC argues that Hughes's "testimony relating to the underemployment of deaf individuals could assist the jury in assessing [S&B]'s claims that Rice and Baker failed to mitigate their damages." *Id.* at 8.

B

Rule 702 does not require that an expert's testimony relate specifically to the facts at issue in a case. *See Strauss Farms, Inc. v. Combs Commodities, Inc.*, 2005 WL 946523, at *3 (D. Kan. Mar. 29, 2005) (allowing testimony about nature of spontaneous combustion of

---

[4]Hughes testified as an expert witness in *EEOC v. Service Temps, Inc.*, No. 3:08-CV-1552-D (N.D. Tex.) (Fitzwater, J.), *aff'd*, 679 F.3d 323 (5th Cir. 2012), tried in this court. The EEOC maintains that, in that case, it alleged that the defendant refused to hire a deaf applicant because of her disability (hearing impairment), and Hughes testified on issues including deaf culture, audism, the use of sign language, common misconceptions about the effectiveness of lip reading, the use of ASL, and the importance of ASL interpreters. As S&B points out, however, in that case the defendant did not challenge Hughes's testimony or file any *Daubert*-related motions, and her testimony in that case has no bearing on the merits of S&B's *Daubert* motion in this case.

cottonseed without applying theory to fire at issue in case).

> [I]t might also be important in some cases for an expert to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case.  For example, experts might instruct the factfinder on the principles of thermodynamics, or bloodclotting, or on how financial markets respond to corporate reports, without ever knowing about or trying to tie their testimony into the facts of the case.  The amendment does not alter the venerable practice of using expert testimony to educate the factfinder on general principles.

Fed. R. Evid. 702 advisory committee's note.  When an expert testifies to educate the factfinder on general principles, "Rule 702 simply requires that: (1) the expert be qualified; (2) the testimony address a subject matter on which the factfinder can be assisted by an expert; (3) the testimony be reliable; and (4) the testimony 'fit' the facts of the case."  *Id.*  The second and fourth requirements merely state that an expert's testimony must be relevant.  *See Miller v. Holzmann*, 563 F.Supp.2d 54, 91-92 (D.D.C. 2008) (citing *Daubert*, 509 U.S. at 591).  If an expert distills a complicated subject into language a jury can understand, and that subject is relevant, she can be admitted as a "teaching witness." *See id.* at 94.

But "[t]estimony is irrelevant . . . when an expert offers a conclusion based on assumptions unsupported by the facts of the case."  *Rolls-Royce Corp. v. Heros, Inc.*, 2010 WL 184313, at *6 (N.D. Tex. Jan. 14, 2010) (Fitzwater, C.J.).  An opinion is unhelpful to a trier of fact if it attempts to apply a general observation about a larger group to particular individuals whose conduct is in question.  *See Rowe Entm't, Inc. v. William Morris Agency, Inc.*, 2003 WL 22272587, at *7 (S.D.N.Y. Oct. 2, 2003) (holding that opinion about

discrimination in concert promotion industry was not relevant to issues in plaintiffs' case because case concerned conduct of booking agencies and promoters toward other promoters, not the industry at large, and the evidence would only inject unfair prejudice).  And where "there is simply too great an analytical gap between the [basis for the expert opinion] and the opinion proffered," the court may exclude the testimony as unreliable.  *Gen. Elec. Co.*, 522 U.S. at 146.

C

Hughes's opinion that "audism and phonocentric views may have prevented accommodations from being made to [Rice and Baker]," Report 5, is neither relevant nor reliable and is excluded.[5]  As the court has explained above, to be admitted, Hughes's testimony must be "more than subjective belief or unsupported speculation."  *Daubert*, 509 U.S. at 590.  Hughes's opinion that audism or phonocentric views motivated S&B's actions with regard to Rice and Baker relies on the assumption that the relevant decisionmakers at S&B subscribed to the types of "anti-deaf" stereotypes described in the Report, and that their actions were motivated by their belief in these stereotypes.  But the EEOC has failed to point to any direct or circumstantial evidence that any employee of S&B actually held the views that Hughes describes in the Report, or that would link the specific employment decisions

---

[5]Although the court is excluding Hughes's testimony to the extent she opines, based on general stereotypes or statistics, that S&B discriminated against, and failed to accommodate, Rice and Baker, the court is not excluding *all* of Hughes's testimony regarding objectives 1 and 2, but will instead permit the EEOC to call Hughes as a "teaching witness" to offer general background information relevant to the claims in this case.

at issue in this case with the types of "anti-deaf" stereotyping that Hughes describes in the Report. To prevail on its ADA claims, the EEOC must establish that S&B *intentionally* discriminated against Rice and Baker. *See, e.g., Delano-Pyle v. Victoria Cnty., Tex.*, 302 F.3d 567, 574 (5th Cir. 2002) ("[A] plaintiff asserting a private cause of action for violations of the ADA or the RA may only recover compensatory damages upon a showing of intentional discrimination."). The EEOC has failed to establish that Hughes's speculation that "audism and phonocentric views *may have prevented* accommodations from being made to [Rice and Baker]," Report 5 (emphasis added), based on her conclusion that society generally holds certain stereotypical views about deaf individuals, is relevant to the facts at issue in this case—i.e., whether S&B *intentionally* discriminated against Rice and Baker, or failed to accommodate their disability during the application process—or that such speculation will assist the jury. *See, e.g., Camp v. Lockheed Martin Corp.*, 1998 WL 966002, at *3 (S.D. Tex. Dec. 29, 1998) ("Testimony that unconscious age stereotyping 'potentially influenced' Lockheed Martin's decisions and that those decisions are 'potential indicators of age bias,' while perhaps of considerable interest to psychologists and sociologists, is not relevant to the issue whether Lockheed Martin intentionally discriminated against Camp because of his age.").

Regarding objective 2, to the extent Hughes intends to rely on general statistics about the number of deaf people using ASL in the United States, the percentage of disabled people overall who have trouble finding work, or Hughes's opinion that deaf people have lower employment rates than other disabled individuals to opine that S&B must therefore have

discriminated against and failed to accommodate Rice and Baker, Hughes's opinion is neither relevant nor reliable for the same reasons.

The EEOC contends that the statistical evidence Hughes offers in connection with objective 2 is relevant to the question whether Rice and Baker failed to mitigate their damages. But the EEOC did not designate Hughes as an expert on this topic. Moreover, even if the EEOC had designated Hughes as an expert on the question of mitigation of damages, the EEOC has failed to show how general statistics on the approximate number of deaf and hard of hearing individuals that need access to employment will assist the jury in deciding whether Rice or Baker failed to mitigate their damages in the specific context of this case.

Accordingly, the court grants S&B's motion to the extent of precluding Hughes from opining that S&B decisionmakers were motivated by audism, phonocentric views, or an anti-deaf attitude in their interactions with, and decisions regarding, Rice and Baker.[6]

_____

[6]Because the court is granting S&B's motion to exclude Hughes's expert opinions in this regard, it does not address S&B's other specific objections (i.e., that Hughes's opinion is based on other false assumptions and unreliable data and is contradicted by witnesses and key documents) regarding "Opinion Group 4," which refers to Hughes's opinion that "audism and phonocentric views may have prevented accommodations from being made to these two Deaf individuals and that S&B Industry, Inc. did not accommodate Baker and Rice to allow them to have participated in the application process," D. Br. 19 (quoting Report 5), and that it is her "professional opinion that Baker and Rice were originally singled out for having used American Sign Language amongst each other. They cho[]se to proceed through an interview through written means, but [S&B] instead exhibited an audistic and phonocentric view of deaf and hard of hearing applicants," *id.* (second alteration in original) (quoting Report 9).

- 11 -

D

S&B moves to exclude Hughes's expert testimony under Rule 403 on the basis that its probative value is substantially outweighed by the dangers of unfair prejudice, confusion of the issues, and misleading the jury.  S&B maintains that

> Hughes' analysis can be distilled as follows: society has phonocentric views and generally thinks deaf persons are not intelligent and cannot work; S&B is part of society; therefore S&B acted in conformity with society's phonocentric views in June 2013.  Hughes provides no analysis or opinion as to whether any specific alleged decision makers at S&B harbored negative phonocentric views or whether any decision at issue in this lawsuit was a specific result of such stereotyped thinking. Instead, Hughes merely instructs the fact finder to assume that because negative stereotypes exist in the world, they necessarily existed at S&B. This "analysis" improperly shifts the burden to S&B to prove that it did not discriminate as opposed to requiring the EEOC to prove by a preponderance of the evidence that Rice/Baker have been subjected to intentional and purposeful discrimination.

D. Br. 24.  S&B also moves under Rule 404(a)(1) to exclude Hughes's opinion that S&B's decisionmakers acted in conformity with the character traits of the "hearing 'majority.'"  *Id.* at 25.

Because the court is granting S&B's motion to exclude Hughes's opinion that the decisionmakers at S&B were motivated by audism, phonocentric views, or an anti-deaf attitude in their interactions with, and decisions regarding, Rice and Baker, it does not consider whether this testimony should be excluded under Rule 403 or 404(a)(1).

- 12 -

IV

S&B contends that Hughes's opinion relating to specific objective 3—determining the type of auxiliary aids that would be most suitable for deaf and hard of hearing individuals when needing to access employment situations—is not helpful or relevant to individuals, like Rice and Baker, who are profoundly deaf.

A

S&B argues that the Report describes auxiliary aids that are unavailable to Rice and Baker; that, to the extent the Report describes potential auxiliary aids that *are* available to Rice and Baker (such as, for example, CART technology), these auxiliary aids have no application to testing iPhone volume levels at S&B; and that Hughes's opinion relating to objective 3 is therefore not relevant, not applicable to Rice or Baker given their profound deafness, and not admissible under *Daubert.* The EEOC responds that S&B's argument relates to the weight to be given to Hughes's expert testimony, not to its admissibility.

B

Hughes's testimony and opinions regarding objective 3 are relevant to the issues in this case. Even assuming *arguendo* that the use of CART technology would not have enabled Rice or Baker to test the volume level on iPhones, Hughes's expert testimony on the types of auxiliary aids that would generally be suitable for deaf and hard of hearing individuals in an employment setting, and on the use of CART technology, in particular, is nonetheless relevant to other issues in this case, such as whether the use of CART technology or another type of auxiliary aid would have been a reasonable accommodation for Rice and

Baker during their job interviews at S&B.  Accordingly, the court rejects S&B's argument that Hughes's expert testimony relating to objective 3 should be excluded from trial on the basis that it is not relevant.

V

S&B also contends that Hughes's opinion is based on faulty data, false assumptions, unidentified sources, flawed methods, is contradicted by sworn testimony, and is outside the scope of the objectives of her Report.

A

S&B asserts that the following are "big picture examples" of Hughes's extremely limited and unreliable data, flawed methods, and faulty assumptions: she failed to review any sworn deposition testimony from anyone in this case either before or after she formed her conclusions; she never interviewed or sought to interview anyone about the events of June 2013 to try to obtain reliable facts; she relied only on information the EEOC presented to her in forming her opinions; she relies on Estela Blacknell's ("Blacknell's") October 2014 affidavit, which the EEOC provided to her, and does not rely on Blacknell's original August 2013 statement to the EEOC, the EEOC's notes from Blacknell's June 2014 interview, or Blacknell's deposition testimony, each of which allegedly contradicts her affidavit; Hughes never reviewed or asked for Rice's or Baker's sworn EEOC charges against Staff Force, in which Rice and Baker stated that they asked Staff Force employee Brenda Trevino ("Trevino") for an interpreter in June 2013 but she did not provide one; Hughes never reviewed or asked for Rice's and Baker's sworn EEOC charges against S&B; although

Hughes reviewed S&B's answer to the EEOC's complaint, she testified that she ignored S&B's defenses, including its defense that it was never Rice's and Baker's employer or prospective employer; Hughes testified that the EEOC told her Staff Force was a "recruiting agency" for S&B, and she accepted this representation at face value, even though it was erroneous, according to the EEOC; and Hughes testified that she wished the EEOC had provided her with Rice's and Baker's policies and procedures checklist with Staff Force and Rice's and Baker's conditional offer letter with Staff Force before she formed any conclusions.   In addition to these "big picture examples," S&B specifically objects to "Opinion Group 5,"[7] arguing that Hughes's comparison of a "standard cell phone quality control warehouse" to S&B's facility is unreliable and inadmissible because Hughes assumes that S&B is a "standard cell phone quality control warehouse" even though she has no experience supplying deaf employees to an Apple iPhone repair and quality control facility and conducted no investigation into such a facility; that Hughes made no inquiry into whether Apple iPhones can be plugged into a computer such that their volume can be checked using visual clues (as opposed to audible rings) and made no inquiry into whether this nonexistent position was open at S&B in June 2013; that Hughes's suggestion that Rice or Baker could have been hired by S&B to be "CDL forklift drivers and operators" is not helpful or admissible because Hughes stated that she was unaware of whether such a position

---

[7]"Opinion Group 5" refers to Hughes's "(1) comparisons of a 'standard cell phone quality control warehouse' to S&B's Apple iPhone repair and testing facility in Fort Worth, (2) opinion on CDL forklift driver and operator positions, and (3) opinion on 'CART technology' as an accommodation."  D. Br. 21 (citing Report 6, 8).

was open or available in June 2013, and neither Rice nor Baker has a CDL or forklift license; and that Hughes's suggestion that Rice or Baker could use CART technology to work assignments at S&B is not helpful or admissible because CART technology cannot detect volume levels on an Apple iPhone.  Finally, S&B objects to "Opinion Group 6,"[8] contending that Hughes's assumption that S&B observed Rice and Baker using sign language and decided that this precluded them from the interview process is undermined by evidence that Rice and Baker were communicating using texting and pen and paper, and that Hughes's conclusion that S&B did not accommodate Rice and Baker is unreliable because writing is an accommodation that allowed Rice and Baker to participate in the interview process.

The EEOC responds that S&B's objections based on Hughes's failure to review certain data or deposition testimony, or the fact that she drew assumptions and stereotypes based upon her work and experience, go to the weight of Hughes's testimony as an expert witness, not its admissibility, and that S&B can address any "false assumptions" or statistical errors during its expected cross-examination of Hughes at trial.  The EEOC maintains that, under Rule 703, there is no requirement that an expert must read every deposition taken in the case or review every charge of discrimination filed by the charging parties.  And it contends that Hughes analyzed the facts and information known to her and formed an

---

[8]"Opinion Group 6" refers to Hughes's opinion that: "[S&B] assumed that [Rice's and Baker's use of] sign language . . . precluded them from the interview process," D. Br. 23 (alteration in original) (quoting Report 6), and that "[S&B] did not accommodate Baker and Rice to allow them to have participated in the application process," *id.* (alteration in original) (quoting Report 9).

opinion based on areas within her considerable expertise.

B

The court declines to exclude Hughes's opinion based on her allegedly limited and unreliable data, flawed methods, or faulty assumptions.  "[Q]uestions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the [trier of fact's] consideration." *Viterbo*, 826 F.2d at 422.  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.  Any deficiencies in Hughes's conclusions as a result of her failure to consider evidence in the record or reliance on false assumptions can be attacked at trial through the same means.  For example, S&B can demonstrate through cross-examination and its own evidence that Rice and Baker sought a temporary assignment at S&B; that Rice and Baker asked Trevino for an interpreter in June 2013, but she failed to provide one; that the volume on Apple iPhones cannot be tested using CART technology; that no CDL forklift driver or operator position was available in June 2013; that neither Rice nor Baker would have been qualified for such a position; and that Rice and Baker communicated using texting and pen and paper.  Accordingly, the court denies S&B's motion to exclude on the basis of Hughes's alleged limited and unreliable data, flawed methods, or faulty assumptions.

VI

S&B objects to Hughes's Report on the basis that it relies on the false assumption that Rice and Baker sought employment with S&B (as opposed to merely seeking a temporary assignment with S&B), and contends that, given Hughes's reliance on this fundamentally false assumption, her opinion is unreliable, irrelevant, and inadmissible. The EEOC responds that these objections go to the weight of the evidence, not to its admissibility and, in any event, that Hughes's assumption that Rice and Baker sought to work at S&B is correct for the reasons explained in the EEOC's summary judgment briefing.

In *S&B I* the court held that "the EEOC has adduced evidence that would enable a reasonable jury to find that, under the common law control test, S&B was Rice's and Baker's prospective employer for purposes of their ADA claims." *S&B I*, 2016 WL 7178969, at *6. Because there is a genuine fact issue regarding whether S&B was Rice's and Baker's prospective employer, the court disagrees that Hughes's reliance on the assumption that S&B was Rice's and Baker's prospective employer renders her opinions unreliable, irrelevant, or inadmissable.

VII

S&B moves to exclude "Opinion Group 1"[9] on the basis that Hughes's conclusion

---

[9]"Opinion Group 1" refers to Hughes's opinion that: "As a systematic society, we are fixated on the concept that one must be able to utilize hearing to be able to effectively perform various tasks.  It's hard for the majority [of society] to fathom that hearing is not essential to becoming a good and effective employee."  D. Br. 15 (alteration in original) (quoting Report 4).

about "systematic society" is not based on any research or identifiable scholarship but instead describes a common frustration of deaf people that Hughes obtained from unidentified articles in the library; that Hughes formed her conclusion that it is hard for the majority of society to fathom that hearing is not essential based on the mere fact that Congress passed the ADA in 1992 and from unspecified "discourse" with unnamed deaf individuals; that Hughes confirmed that she conducted no surveys or studies of "society" or of "the majority" to support these sweeping conclusions; that Hughes admitted that she has never been to S&B, never interviewed anyone at S&B, reviewed no deposition testimony of anyone at S&B, and conducted no investigation into these issues to try to determine whether or not S&B conformed with society's purported fixation with hearing; and that "Opinion Group 1" is therefore an unsupported stereotype, is not based on reliable data or reliable methodology, and is not helpful to the jury. The EEOC does not respond to these arguments other than to generally contend that S&B's objections go to the weight, not the admissibility, of Hughes's conclusions.

To the extent that S&B objects to "Opinion Group 1" based on Hughes's relying on generalized views about the "majority of society" to opine that the individuals at S&B intentionally discriminated against, or failed to accommodate, Rice and Baker, the court has already precluded Hughes from offering her opinions in this regard at trial. To the extent S&B objects to Opinion Group 1 on the basis that Hughes has not based her conclusions on reliable data or methodology, the court agrees that Hughes's opinion is deficient in this respect. The EEOC does not dispute that Hughes's conclusions about "systematic society"

or "the majority" are not based on any research or identifiable scholarship.  Accordingly, the court grants S&B's motion to exclude this evidence.

## VIII

S&B objects to "Opinion Group 3"[10] on the basis that Hughes testified that her opinion on "hearing interviewer" potential biases are speculation about society in general and do not relate to anyone at S&B who interviewed Rice or Baker for a potential job in June 2013, and are therefore unreliable and unhelpful to the jury.  The court agrees.  The EEOC does not dispute that Hughes's opinions about prejudices the hearing interviewer "might have" are based on speculation about society in general and do not relate to anyone at S&B.  Accordingly, the court grants S&B's motion to exclude these opinions.

## IX

In sum, the court grants S&B's motion to exclude Hughes's opinion that "audism and phonocentric views may have prevented accommodations from being made to [Rice and Baker]," Report 5, and grants S&B's motion to exclude "Opinion Group 1" and "Opinion Group 3," as defined in S&B's motion.  The court otherwise denies S&B's motion.

---

[10]"Opinion Group 3" refers to Hughes's opinion that: "the hearing interviewer might have prejudices about the intelligence or capabilities of the deaf.  Or a hearing interviewer may have phonocentric views about their own, spoken language, since they do not understand a complex visual language, such as [ASL]."  D. Br. 18 (quoting Report 5).

*   *   *

For the reasons explained, S&B's motion to exclude the expert report and testimony of Heather Hughes is granted in part and denied in part.

**SO ORDERED**.

January 24, 2017.


SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE